Tarek H. Zohdy (SBN 247775)
Cody R. Padgett (SBN 275553)
Laura E. Goolsby (SBN 321721)
Nathan N. Kiyam (SBN 317677)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the Proposed Classes and
Subclasses*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR NELSON and SARAH NELSON, as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## I.   **INTRODUCTION**

1.     Plaintiffs Trevor Nelson and Sarah Nelson bring this action individually and on behalf of all persons who purchased or leased in California, certain vehicles equipped uniformly with defective engines that were designed, manufactured, distributed, and sold/leased by Ford Motor Company and/or its related subsidiaries or affiliates ("Ford"), as further described below ("Class Members").

## II.   **NATURE OF THE ACTION**

2.     The vehicles ("Class Vehicles") at issue in this action include certain Ford vehicles equipped with 2.3L EcoBoost engines (the "EcoBoost engines"), which discovery will show are identical in design to Ford's 1.5L, 1.6L and 2.0L Ecoboost Engines which only differ in displacement.[1]

3.     The EcoBoost engines in each of the Class Vehicles have the same displacement (2.3 liters) and are substantially the same from an engineering and component standpoint. The EcoBoost engines in the Class Vehicles contain the same relevant components and made of the same materials.

4.     The EcoBoost engines in the Class Vehicles have a critical defect that causes engine coolant—which is vital to the safety, functionality and longevity of the engine—to leak into the engine's cylinders (the "Engine Defect"). The lack of coolant caused by the leaks results in overheating, and can, even at low mileage, result in catastrophic engine failures and potential engine fires. The presence of coolant within the cylinders of the engine, alone, can also result in power loss, cylinder wall corrosion, oil dilution and contamination, and engine failure.

5.     Ford has failed to provide an effective solution to consumers who purchased or leased Class Vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Discovery will show that instead of replacing the engine block, Ford merely applies superficial stopgap, "Band-Aid" remedies such recalibrating the engine software and installing coolant level sensors. The engine

---

[1] The Class Vehicles are: 2015-2024 Ford Mustang; 2019-2024 Ford Ranger; 2016-2024 Ford Explorer; 2021-2024 Ford Bronco; 2015-2020 Lincoln MKC, and 2020-2022 Lincoln Corsair.

recalibration alters the performance of the class engines and the coolant sensor alerts consumers when their coolant has been depleted, so that they can replenish it. However, neither of these "Band Aide" remedial measures prevent further coolant intrusion into the engine cylinders and engine oil. In some instances, Ford just replaces certain parts other than the defective engine block, thereby failing to address the root cause of the Engine Defect.

6.     These ineffective half measures force consumers to return repeatedly for service and to continue driving a vehicle at risk of future damage to the engine and components, engine failure, and engine fires.

7.     Consumers whose EcoBoost engines overheat or fail when the vehicle is out of warranty must pay out-of-pocket for the necessary repairs and, again, may have to return for repeated service if Ford does not replace the defective engine with a non-defective engine block. These repairs, including a full engine replacement, can cost thousands, and sometimes tens-of-thousands, of dollars.

8.     The Engine Defect interferes with Plaintiffs' and Class Members' safe, comfortable, and expected use of their Class Vehicles. It exposes them to severe risk created by engine failures and engine fires, and it requires them to pay for repairs and/or engine replacement.

9.     Discovery will show that before selling or leasing the Class Vehicles, Ford knew about the Engine Defect through sources including pre-production testing, pre-production design failure mode analysis, pre-release evaluation and testing; repair and warranty data; replacement part sales data; high failure rates and analysis in response; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; consumer complaints made to Ford's authorized dealerships, who are Ford's agents for vehicle sales, leases, servicing, and repairs, testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.

10.     Despite its knowledge, Ford failed to disclose and actively concealed the

Engine Defect from Class Members and the public, and Ford has continued to market and advertise the Class Vehicles as safe, comfortable, and of high quality.

11.   As a result of Ford's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain the Engine Defect, have manifested, and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket, unreimbursed costs and expenses relating to the Engine Defect.

## III.   **PARTIES**

### A.   **Plaintiffs Trevor Nelson and Sarah Nelson**

12.   Plaintiffs Trevor Nelson and Sarah Nelson are individuals residing in Costa Mesa, California.

13.   Plaintiffs own a 2018 Ford Mustang with a 2.3L EcoBoost engine, which they purchased new on January 23, 2018 from Galpin Ford in North Hills, California. Plaintiffs purchased the vehicle for personal, family, and household use.

14.   Passenger safety and reliability were important factors to Plaintiffs' decision to purchase the vehicle. Prior to purchasing their Class Vehicle, Plaintiffs researched the vehicle by, among other things, visiting a Ford dealership, conducting substantial internet research, and visiting Ford's website to view the specifications, features, options, and configurations for the Ford Mustang. Plaintiffs also reviewed the vehicle's "Monroney Label" (window sticker) before purchase and test drove the vehicle with a representative from Ford's authorized retail facility. Based on Ford's representations, Plaintiffs were led to believe that their Class Vehicle was, among other things, a safe, reliable, and high-quality vehicle.

15.   Despite Plaintiffs' research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the Class Vehicle contained the Engine Defect, which could cause the vehicle's engine to leak coolant into the engine cylinders,

overheat, and fail, as well as even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Plaintiffs were not aware of and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

16.   Ford's omissions were material to Plaintiffs. If Ford had adequately disclosed these facts before Plaintiffs purchased the vehicle, they would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

17.   On or around December 22, 2023, Plaintiffs took the vehicle to Theodore Robins Ford, an authorized Ford dealership located in Costa Mesa, California because the orange engine light had illuminated and Plaintiffs noticed that the vehicle lurched when put into drive, did not start smoothly, and shook when turned on. At the time, their vehicle had approximately 82,765 miles on the odometer. The dealership performed diagnostics and found that there was fluid intrusion in the engine from the radiator. The dealership quoted the Nelsons $9,000 for a refurbished replacement engine with a 3-year warranty.

18.   Thereafter, and on March 18, 2024, after giving Ford an opportunity to inspect their vehicle, Plaintiffs had their engine repaired by Theodore Robbins Ford at the out-of-pocket cost of $9,460.70.

19.   Despite complaining to Ford about the Engine Defect, Plaintiffs are not confident that their vehicle has or will ever be adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

20.   As a result of Ford's misconduct and concealment of the Engine Defect Plaintiffs have overpaid for their Class Vehicle, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

21.   Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further,

based on their experience, Plaintiffs are not confident that they will be able to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

22.   At all times, Plaintiffs, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**B.   <u>Defendant Ford Motor Company</u>**

23.   Defendant Ford Motor Company is a Delaware limited liability company with its Corporate Headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor Company is registered to do business in the State of Delaware. Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles in California and throughout the United States.

24.   At all relevant times, Ford was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California and throughout the United States of America.

25.   In order to sell vehicles to the general public, Defendant enters into agreements with dealerships who are then authorized to sell its branded vehicles such as Fords and Lincolns to consumers such as Plaintiffs. In return for the exclusive right to sell new Ford and/or Lincoln vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers. These contracts give Defendant a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Defendant's explicit instructions, issued through service manuals, technical service bulletins, and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can

receive services under Defendant's issued warranties at dealer locations that are convenient to them.

26.   Defendant also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Defendant is also responsible for the production and content of the information on the Monroney Labels.

27.   Defendant is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## IV.   JURISDICTION AND VENUE

28.   The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) and the Class Action Fairness Act ("CAFA"). Plaintiffs and other Class Members are residents and citizens of states different from the home states of the Defendant, and the amount in controversy in this action for the Class exceeds $5,000,000.00.

29.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to this Action occurred in this District and Defendant conducts substantial business in, and has gained substantial benefit from, doing business in this District.

30.   Defendant markets, sells, and leases vehicles to consumers throughout this District, a significant number of Defendant's customers are residents of this District, and the wrongful acts and omissions alleged herein have affected consumers in this District. Defendant is therefore subject to personal jurisdiction in this District.

31.   Plaintiff Trevor Nelson's venue declaration pursuant to Cal. Civ. Code § 1780(d) is attached hereto as **Exhibit 1**.

## V.   FACTUAL ALLEGATIONS

32.   In 2009, Ford began producing the EcoBoost engine, which are gasoline-

fueled, turbocharged, direct-injection (also called "GTDI") engines. EcoBoost engines are marketed as providing low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

33.    Because of the Engine Defect, the EcoBoost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to seep into the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure, thereby compromising the comfort, safety, and enjoyment of Plaintiffs and Class Members, and requiring them to pay out-of-pocket to temporarily ameliorate the problem and/or replace the defective EcoBoost engine with an equally defective engine, leaving the Class Vehicle susceptible to repeated failures like those experienced by Plaintiffs.

### A.    **The Engine Defect**

34.    Discovery will show that the Engine Defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block, as seen here:

 

35.    In a non-defective engine, liquid coolant is used to ensure that the engine does not overheat. The coolant circulates through a set path within the engine block

7

and cylinder head, cooling the engine. The liquid gathers heat due to contact with the engine and then flows through a hose and into the radiator to cool back down. Once its temperature has lowered, the coolant returns to the engine, and continues to circulate.

36.   In the Class Vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders.

37.   The coolant leak causes two related problems. First, the leak results in insufficient coolant levels and, consequently, engine overheating. Engine overheating is well known to cause catastrophic damage to an engine. For example, overheating can cause the cylinder head and/or block to crack. Engine overheating can also warp the cylinder head and cause the failure of other internal engine components, such as pistons, rings, valves, bearings, etc. Additionally, when an engine overheats, it can cause a dramatic loss of oil viscosity and lubricity which can cause internal rotating engine components (such as camshafts, crankshafts, connecting rods, wrist pins, and bearings) to seize and fail. In some instances, engine overheating can result in engine fire.

38.   The second related problem caused by the coolant leak occurs as a result of the coolant leaking *into* the cylinders. Coolant should not enter the cylinders, and when it does, it causes the engine to misfire. Coolant in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, sometimes resulting in smoke emitting from the vehicles' exhaust. In addition, coolant that enters the cylinders mixes with the oil on the cylinder walls, causing oil dilution and contamination, which, in turn, causes corrosion and excessive wear on bearings and other internal engine surfaces.

39.   The Engine Defect can occur at low mileage, often while the vehicle remains within the warranty period.

40.   Ford's insufficient Band-Aid repair measures, such as installing a low coolant sensor, calibration changes and/or the replacement of faulty EcoBoost engines in Class Vehicles with equally defective replacement engines leave Class Vehicles susceptible to repeated failure.

41.   Because of the Engine Defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the Engine Defect and leaves consumers still subject to future risk of failure.

42.   Ford has apparently developed a feasible alternative design for an EcoBoost engine that does not contain the defect Class Vehicles suffer from but has not used these newly-developed non-defective engines to replace failed EcoBoost engines installed in Class Vehicles, leaving Class Members to face the specter of repeated engine failure and engine fires.

**B.    The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public.**

43.   The Engine Defect poses a safety hazard to drivers, passengers, and the public because an engine with insufficient coolant and/or coolant in its cylinders can misfire, suddenly fail, catch on fire while the vehicle is otherwise in normal operation. Sudden engine failures and engine fires create serious risks of injury or death to those inside the vehicle and to others nearby.

44.   For instance, one complaint filed with NHTSA detailed a consumer's experience while driving a 2018 Ford Mustang which they purchased for their daughter as a graduation gift. "[W]hile she was driving it the engine malfunctioned stranding her on a busy highway."[2]

45.   Another 2017 Ford Edge owner described experiencing complete engine failure while on the highway: "Suddenly the car basically went dead while in motion going 75 miles per hour. I had to steer it off the highway and turn it off, leaving us

---

[2] NHTSA ID No. 11595235, Complaint Date April 1, 2024.

stranded on the side of the highway for 4 hours." This event occurred after the driver had received a check engine alert, and had the engine's head gasket replaced due to coolant in the cylinder. Following the total engine failure, it was determined that coolant had leaked into the cylinder, causing misfiring and engine failure, for the second time in less than 12 months. The complaint stated that the author was forced to pay $7,000.00 for a full engine replacement. [3]

46.   As these instances demonstrate, engine failures put the vehicle occupants and others on the road in extreme risk of accidents, and engine fires pose a potentially lethal hazard.

47.   As further detailed below, the NHTSA website is replete with similar complaints of smoking vehicles, engine failures while the car is in operation on the road, and fires. Additionally, these complaints highlight that the Engine Defect often requires repeated repairs, each of which can cost consumers thousands of dollars.

C.   **Ford Knew That the EcoBoost Engines in the Subject Vehicles Were Defective Since At Least 2012, But It Continued to Sell These Engines Anyway.**

1.   **Over the Past Decade, Ford Has Issued Multiple Ineffective Recalls for Issues Relating to Coolant Leaks and Overheating in EcoBoost Engines.**

48.   Consumers began to experience failures with the EcoBoost Engine almost immediately after Ford released it into the market in 2012, which prompted Ford to subsequently issue a series of inadequate, piecemeal recalls.  Ford has known about the Engine Defect since at least June 2012, when it received an unusually high number of complaints that revealed serious safety issues with the EcoBoost Engine. Indeed, as Ford later informed NHTSA, between September 7, 2012 and November 29, 2012, Ford was aware of at least nine incidents during which vehicles with the EcoBoost engine caught on fire.

49.   In light of the mounting engine failures from the problematic launch of

---

[3] NHTSA ID No. 11338725, Complaint Date July 11, 2020.

the EcoBoost Engine, Ford issued Recall Campaign 12S41 (NHTSA Recall No. 12V551) (the "2012 Recall") on November 30, 2012, and announced that vehicles equipped with the 1.6L EcoBoost engine "may experience engine overheating that can lead to fluid leaks that may come into contact with the hot exhaust system that may result in a fire."  As explained in the chronology Ford submitted to NHTSA along with notice of the problem, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field.

50.    Ford limited the 2012 Recall to only certain 2013 Ford Escape and 2013 Ford Fusion vehicles with the 1.6L EcoBoost engine.  Thus, rather than recalling the full fleet of Ford vehicles on the market that were equipped with the defective EcoBoost engine—including the 1.5L and 2.0L EcoBoost Engines that were built on the same design and made from the same materials—Ford chose to recall only a portion of Escapes and Fusions with the EcoBoost Engine, and it continued to sell the Class Vehicles despite the ongoing danger of the Engine Defect.

51.    Ford's supposed "fix" with the 2012 Recall was ineffective.  Rather than redesigning and replacing the EcoBoost Engine to address the root cause of the problem, Ford's recall servicing involved a mere check for diagnostic trouble codes and engine fluid leaks, and a reprogram of the vehicle's powertrain control module. In other words, the remedy was ineffective because it merely attempted to address the symptoms of the Engine Defect but not its actual cause.

52.    As part of the 2012 Recall, Ford established a "cross functional task force to further investigate these fires." Testing conducted as part of this investigation "indicated engine overheating and cracked cylinder heads that allowed oil to leak." Indeed, on November 18, 2013— nearly a year after Ford rolled out the 2012 Recall— Ford's Field Review Committee "determined that a safety defect exists, and that a voluntary safety recall should be conducted."

53.    On November 25, 2013, Ford initiated Recall Campaign 13S12 (NHTSA

Recall No. 13V583) (the "2013 Recall"). As indicated in the chronology Ford submitted to NHTSA along with notice of the problem, its investigation was linked to the 2012 Recall, and further, Ford had been involved in an ongoing investigation which led to the 2013 Recall since that time. Further, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field. As with the 2012 Recall, Ford failed to extend a fix to all of the Class Vehicles and instead limited the recall to 2013 Ford Escapes with the 1.6L EcoBoost engine (approximately 139,917 vehicles). The 2013 Recall again warned of the risk of "localized overheating of the engine cylinder head," which "may cause the cylinder head to crack, causing an oil leak that may result in a fire in the engine compartment." The 2013 Recall superseded the 2012 Recall.

54.    Ford's solution in the 2013 Recall was to add "a new engine temperature sensor."[4]  This sensor could detect when the engine was overheating but it did nothing to prevent the coolant leaks.  Again, Ford's recall remedy was ineffective because it attempted to address only the symptoms of the Engine Defect and not its root cause.

55.    Because the 2012 Recall and the 2013 Recall were ineffective and incomplete, owners of vehicles equipped with the EcoBoost Engine continued to experience problems with overheating and fluid leaks.  In 2016, Ford again investigated an ongoing series of numerous complaints about engine fires.  As Ford later informed NHTSA, starting in June 2016 Ford's North American Critical Concern Review Group "reviewed data related to underhood fire allegations on 2014 Escape vehicles equipped with 1.6L GTDI [EcoBoost] engines."  This data included dozens of customer reports of engine overheating caused by coolant loss from a cracked cylinder head.  Based on this data, Ford ultimately concluded the EcoBoost Engines were experiencing yet another safety defect, which was evidently caused by

---

[4] Letter from Ford to All U.S. Ford and Lincoln Dealers, "SUBJECT: STOP SALE / DEMONSTRATION / DELIVERY HOLD" (Jan. 23, 2014), available at https://static.nhtsa.gov/odi/rcl/2013/RCRIT-13V583-1656.pdf (last accessed Sept. 27, 2022).

the same root cause: the Engine Defect.  Despite receipt of this data confirming that the EcoBoost Engines were continuing to experience the Engine Defect, Ford did not attempt to take steps to remedy the issue for nearly a year.

56.    On March 27, 2017, Ford informed NHTSA that vehicles equipped with the 1.6L EcoBoost engine "may experience underhood fires due to localized overhearing of the engine cylinder head, potentially leading to cracks and resulting in oil leaks." Indications of a possible engine overeat include "[a] visible coolant leak, an engine overheat warning message in the instrument cluster, repeatedly refilling coolant, or a low level in the coolant bottle."

57.    Ford's Field Review Committee reviewed the data from these incidents and concluded that it would be necessary to issue a safety recall for "all vehicles in North America equipped with a 1.6L GTDI engine built prior to February 14, 2014." Accordingly, on December 13, 2017, Ford issued Recall Campaign 17S09 (NHTSA Recall No. 17V209) (the "2017 Recall"). As indicated in the chronology Ford submitted to NHTSA along with notice of the problem, its investigation was linked to the 2013 Recall, and further, Ford had been involved in an ongoing investigation which dated from June 2016.  That investigation included a review of reports of engine overheating in the winter months of early 2016.  Further, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field. The 2017 Recall applied to the following vehicle models equipped with the 1.6L EcoBoost engine: 2014 Ford Escape, 2014-2015 Ford Fiesta ST, 2013-2014 Ford Fusion, and 2013-2015 Ford Transit Connect.

58.    The 2017 Recall called for the installation of a coolant level sensor in the recalled vehicles to alert drivers when the engine coolant needed to be refilled. As with the prior recalls, Ford once again failed to address the root cause of the Engine Defect with the 2017 Recall.  The coolant level sensor did nothing to prevent the continued coolant leaks and was yet another woefully inadequate recall strategy. And like the previous recalls, Ford continued to limit the recall to only certain vehicles

with the 1.6L EcoBoost engines, even though the 1.5L, 2.0L, and 2.3L EcoBoost engines were designed with the same engine block design, are made from the same materials, and suffer from the same Engine Defect.

59.   Despite receiving complaints regarding vehicles with the 1.5L, 1.6L, 2.0L, and 2.3L EcoBoost Engines, Ford has never expanded its recalls to all vehicle models and model years that suffer from the Engine Defect.

60.   The 2012, 2013, and 2017 Recalls were insufficient to address the underlying Engine Defect and do not come close to remedying the ongoing harm to Plaintiffs and Class Members. Ford knew about the dangers of the Engine Defect but still proceeded to sell Class Vehicles to Plaintiffs and Class Members without disclosing the true defective nature of the EcoBoost Engine.  Rather than warning the public about the Engine Defect and issuing a comprehensive recall that would tackle the root cause in the EcoBoost Engine's design for all Class Vehicles, Ford chose to put profits over safety so it could boost its profits in vehicles sales.

### 2.   Ford Knew of the Engine Defect from Its Pre-Release Design, Manufacture, Engineering, and Testing Data.

61.   During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Ford necessarily would have gained comprehensive and exclusive knowledge about the EcoBoost Engine, particularly the basic engineering principles behind the construction and function of the engine and the expected conditions and uses the engine would encounter in ordinary use.

62.   An adequate pre-release analysis of the design, engineering, and manufacture of the EcoBoost Engine in the Class Vehicles would have revealed to Ford that the engine was defective and susceptible to leaking coolant, thus causing the Vehicle to overheat.

63.   Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free

from defect and align with Ford's specifications.[5]   This is particularly true of components and systems which Ford intends to put in millions of its vehicles, as the company intended with the EcoBoost engine.

64.   In particular, Ford has extensive proving grounds and testing facilities to ensure that prototype engines and other vehicle components meet specifications and to test for unforeseen defects in design and manufacture.  Ford has such facilities in Thailand, India, Australia, the Middle East, China, and throughout the United States, including the extensive Dearborn Development Center located in Dearborn, Michigan, and Mexico, where "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[6]

65.   One of the test protocols is the Total Durability Cycle.  As described by Ford, prototype and pre-production vehicles go through:

> sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks. Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test. Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes.[7]

66.   Ford has standard durability and reliability testing for all its produced engines, per Ford's Advanced Engine Design and Development manager, Brett

---

[5] Akweli Parker, *How Car Testing Works*, HowStuffWorks.com, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited Sept. 27, 2022).

[6] Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit, Ford Media Center (July 10, 2019), https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last visited Sept. 27, 2022).

[7] *Id*.

Hinds.[8]  This includes 20 different dynamometer tests to verify the reliability of the engine under maximum speeds and loads, as well as coolant and oil temperatures.[9]

67.   One such test is the Road Cycle Durability test, which is designed to replicate customer driving and maintenance patterns.  This test includes one thousand cold starts, followed by sustained operation at peak torque and power.  During the course of this test, the coolant temperature can range from 53 degrees Fahrenheit to 203 degrees Fahrenheit. Ford runs this test for 1,000 hours, ultimately simulating 60,000 road miles under the most extreme conditions.  This test in particular would have revealed the Defect, which often manifests prior to 60,000 miles during typical vehicle operations.[10]

68.   Ford has confirmed that such tests are global and were done on all the EcoBoost engines, including the 1.5L, 1.6L, 2.0L and 2.3L capacity models.  In a 2014 *Car & Driver* article, Mike Herr, an engine durability specialist at Ford, stated that Ford's engine tests "incorporate[e] the most-extreme tests for each operation."[11] The article goes on to describe the global thermal test, in which engineers run an engine up to peak power and when the water temperature hits 230 degrees, they turn off the engine and pump minus-22-degree coolant through the engine for 15 minutes. They then turn on the engine, allow it to rest for 20 seconds, then rev to top performance, so that the temperature rises to 230 degrees once more and oil temperature rises to 280.  This process is repeated five times, and any given engine

---

[8] Ford EcoBoost Engines Cruise 1 Million Miles in in Testing, Delivering Fuel Economy, Performance, Automotive-Fleet.com, (Sept. 5, 2008), https://www.automotive-fleet.com/62083/ford-ecoboost-engines-cruise-1-million-miles-in-testing-delivering-fuel-economy-performance (last visited Sept. 27, 2022).

[9] *Id.*

[10] *Id.*

[11] Csaba Csere, How Powertrain Development Teams Ensure Durability by Beating the Crap Out of Engines, CAR & DRIVER, Feb. 2014, *available at*, https://www.caranddriver.com/news/a15366911/how-powertrain-development-teams-ensure-durability-by-beating-the-crap-out-of-engines/ (last visited Sept. 27, 2022).

undergoes this process 350 times during the full durability test.[12]  This testing would have necessarily revealed the Engine Defect before Ford began selling the Class Vehicles.

69.    Such testing is required on all Ford engines but was especially important on the EcoBoost engine.  As described by Jeff Kolodziejczyk, a Ford engine-development supervisor, "Our EcoBoost engines have more-complex cooling systems to cope with integrated exhaust manifolds, turbochargers, and local hot spots. Our 1.6-liter has four separate valves to regulate cooling flow."[13]

70.    As a result, discovery will show that Ford's durability and reliability testing, done both before EcoBoost engines were built into the first of the Class Vehicles and after they were installed in Class Vehicles, revealed the existence of the Defect to Ford.  Such testing was repeated for each production model year, and was particularly robust in 2013 as the re-designed 4-cylinder EcoBoost engines were to be installed in model year 2015 vehicles built in 2014.[14]  As such, Ford would have been made aware of the Defect prior to sale of the first Class Vehicles.

### 3.    Ford Knew About the Engine Defect from Voluminous Internal Data on Repairs and Consumer Complaints.

71.    Ford was also aware of the Engine Defect through repair data, warranty data, and other internal processes. Indeed, shortly after Ford released the EcoBoost Engine, customers began to request warranty repairs and complained to Ford dealers, personnel, and other sources about coolant leaks in their Class Vehicles.

72.    One of Ford's internal processes for reviewing complaints related to defects like the Engine Defect is Ford's Critical Concern Review Group (CCRG). When Ford becomes aware of a safety-related defect—whether through warranty

---

[12] *Id.*

[13] *Id.*

[14] Richard Truett, *Ford to replace 2.0-liter EcoBoost after just 4 years*, AUTOMOTIVE NEWS, (June 30, 2014), available at https://www.autonews.com/article/20140630/OEM06/306309977/ford-to-replace-2-0-liter-ecoboost-after-just-4-years (last visited Sept. 27, 2022).

repair data, customer service reports, or other sources—the CCRG will investigate the issue, review and assess the problem, and recommend corrective actions including recalls.

73.   On information and belief, the level of warranty claims, consumer complaints, and comments from Ford dealers and technicians would have informed the CCRG and other Ford employees and quality-control entities of the Engine Defect.  Indeed, as discussed above, Ford informed NHTSA that the CCRG analyzed incident data relevant to the Engine Defect and ultimately helped conclude that Ford should issue numerous recalls related to this issue.

74.   Preliminary discovery bears out the assertion that the CCRG or other internal Ford processes have known about the Engine Defect at least since Ford released the EcoBoost Engine.  For example, according to data Ford submitted to NHTSA in connection with the agency's investigation of the Engine Defect, between 2012 and 2018, MY2013 and MY2014 Ford Escape owners and lessees filed over ***24,000*** warranty claims. Based on Plaintiffs' initial review of these materials, at least several thousands of these claims appear to relate to the Engine Defect.

75.   In sum, from 2012 to 2018, Ford received thousands of internal complaints about and performed service on thousands of EcoBoost Engine-equipped vehicles leaking coolant and overheating.  Despite this, Ford did not notify consumers about the scope of the Engine Defect. When Ford did issue recalls, it did not extend them to the full scope of affected vehicles, nor did its solution effectively fix the Engine Defect.  Although the existing data demonstrates the severity of the problem and Ford's early knowledge of these issues, further discovery will reveal the full magnitude of the complaints.

### 4.   Ford Was Aware of the Engine Defect from Class Member Complaints Collected by NHTSA.

76.   Ford also knew or should have known about the Engine Defect based on the unusually high volume of consumer complaints submitted to NHTSA.

77.     Consumers began filing complaints to NHTSA about issues relating to the Engine Defect as early as October 16, 2012, when one owner of a 2013 Ford Escape with a 1.6L EcoBoost Engine, reported that the car "burst into flames and was destroyed" after "the high engine temperature warning light came on" while driving on the highway and the vehicle coasted to a stop. (NHTSA Complaint ID 10480692).

78.     Over the next decade, consumers continued to complain about coolant leaks and overheating in vehicles equipped with the EcoBoost Engine. These complaints are spread consistently over the Class Period across the various Class Vehicles, and all reported serious problems with the EcoBoost Engine.  A selection of these complaints follows.

a.      April 11, 2013 (NHTSA Complaint ID 10505960; 2013 Ford Escape, 1.6L): "VEHICLE REPORTED ENGINE TEMPERATURE TOO HIGH AND THAT I SHOULD PULL OVER SAFELY. THIS IS THE SAME ENGINE OVERHEATING / FIRE HAZARD PROBLEM SUPPOSEDLY FIXED DURING DECEMBER 2012 RECALL."

b.      June 26, 2013 (NHTSA Complaint ID 10521995; 2013 Ford Escape, 1.6L): "MY CAR HAS OVERHEATED TWICE AFTER THE RECALL FIX.   MY COOLANT WAS VIOLENTLY BOILING OVER.   MY TRANSMISSION IS ALSO GROSSLY SHIFTING INCORRECTLY.  I ALMOST GOT HIT BY ANOTHER CAR WHEN I WAS TRYING TO MERGE ONTO THE FREEWAY SINCE IT WASN'T GOING TO THE NEXT GEAR.   THE TRANSMISSION REDLINED AND THEN SHIFTED.  I CHECKED MY OBT AND I'M NOT GETTING ANY CODES FOR THESE PROBLEMS.    I'M NOT SURE WHAT TO DO ANYMORE SINCE ANYTIME I'VE BROUGHT MY CAR IN THEY HAVEN'T FOUND ANY ISSUES.  I'VE BROUGHT MY CAR IN SEVERAL TIMES ABOUT THE ENGINE AND TRANSMISSION AND NO ISSUES HAVE BEEN FOUND.  I DRIVE THROUGH THE SANTA CRUZ MOUNTAINS EVERY WEEK AND I'M AFRAID ONE DAY MY ENGINE WILL

CATCH ON FIRE (HILLY ROADS AND LOW SPEEDS CAUSE THE ENGINE TO RUN HOT).   IT WOULD BE DISASTROUS FOR THE STATE OF CALIFORNIA IF A WILDFIRE WAS STARTED DUE TO THIS CAR.  *TR"

      c.    November 19, 2013 (NHTSA Complaint ID 10552925; 2013 Ford Escape, 1.6L): "MY CAR IS STILL OVERHEATING AFTER BRINGING IT INTO THE DEALER 6 TIMES.  THEY HAVE DONE THE RECALL FIX TWICE NOW.  THERE APPEARS TO BE SMOKE COMING OUT OF MY HOOD NOW WITH A BURNT SMELL.  THE BURNING AND COOLANT SMELL IS TRIGGERING MY ASTHMA WHILE DRIVING.   *TR"

      d.    January 27, 2014 (NHTSA Complaint ID 10561719; 2013 Ford Escape, 1.6L): "I PURCHASED MY 2013 FORD ESCAPE IN SEPT 2012. SINCE THAT TIME THE VEHICLE HAS BEEN RECALLED 5 TIMES FOR FIRE HAZARDS. I HAVE TAKEN IT IN TWICE FOR THE SMELL OF ANTIFREEZE AND A CHECK ENGINE LIGHT. I WAS TOLD THE SMELL WAS MY AIR FRESHENER, I THEN TOOK IT BACK A SECOND TIME WITH THE CHECK ENGINE LIGHT ON AND HAS A SENSOR REPLACED THAT I WAS TOLD WOULD BE THE REASON I WAS SMELLING ANTIFREEZE. IT HAS BEEN RECALLED SEVERAL TIMES FOR FIRE HAZARDS THAT ARE VERY SIMILAR TO THE CURRENT RECALL. I AM VERY CONCERNED ABOUT THE MULTITUDE OF RECALLS FOR FIRE HAZARDS ON THIS CAR. I DRIVE A LOT OF MILES AS I AM A HOME HEALTH CARE NURSE AND ARE FREQUENTLY IN VERY RURAL AREAS. MY CONCERN IS THIS,1. HOW CAN I TRUST THAT MY VEHICLE WILL SAFELY GET ME TO MY TWO JOBS.  2. THE NUMBER OF RECALLS FOR FIRE HAZARDS LETS ME KNOW THAT THEY HAVE NOT PROPERLY FIXED MY CAR IN THE PAST RECALLS. 3. I AM A MOTHER OF A CHILD THAT IS VERY INVOLVED IN SPORTS THAT REQUIRES ME TO TRANSPORT MANY TEENAGERS TO MULTIPLE MEETS, SOME MANY MILES FROM HOME.  I HAVE TALKED

1   TO FORD MOTOR COMPANY WITH MY CONCERNS AND THEY HAVE
2   ONLY TOLD ME THAT THERE IS NOTHING I CAN DO ABOUT THIS. THEY
3   HAVE NO SOLUTION TO THIS AND STATED THAT I COULD NOT FILE
4   LEMON LAW BECAUSE IN  TN IT HAS TO BE IN THE SHOP FOR MORE
5   THAT 30 DAYS. I ASKED IF THEY WOULD REPLACE IT WITH A .2.0 LITER
6   CAR AS THEY HAVE NOT HAD THE RECALLS THAT MY CURRENT 1.6L
7   HAS BUT I WAS LAUGHED AT. I AM VERY CONCERNED ABOUT MY AND
8   MY FAMILIES SAFETY.  *TR"

9          e.     May 23, 2017 (NHTSA Complaint ID 10991197; 2013 Ford
10  Fusion, 1.6L): "TL* THE CONTACT OWNS A 2013 FORD FUSION. WHILE
11  DRIVING AT ANY SPEED, THE VEHICLE OVERHEATED AND SHUT OFF.
12  THE VEHICLE WAS PUSHED TO THE SIDE OF THE ROAD AND
13  RESTARTED. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS
14  DIAGNOSED THAT THERE WAS A LEAK IN THE COOLING SYSTEM. THE
15  COOLING SYSTEM WAS CLEANED AND THE WATER PUMP WAS
16  REPLACED, BUT THE FAILURE RECURRED. THE VEHICLE WAS TAKEN
17  BACK TO THE DEALER AND THE BATTERY WAS REPLACED, BUT THE
18  FAILURE RECURRED AND THE CHECK ENGINE INDICATOR
19  ILLUMINATED. THE CONTACT TOOK THE VEHICLE TO THE DEALER.
20  THE TECHNICIAN REPLACED THE COOLANT VALVE AND
21  REPROGRAMMED THE COMPUTER SYSTEM. A FEW MONTHS LATER,
22  THE ENGINE VIBRATED WHEN THE AIR CONDITIONER WAS
23  ACTIVATED. THE VEHICLE WAS TAKEN TO THE DEALER AND THE AIR
24  CONDITIONING COMPRESSOR WAS REPLACED. THE FAILURE
25  RECURRED AND THE CHECK ENGINE INDICATOR ILLUMINATED. THE
26  VEHICLE WAS TAKEN BACK TO THE DEALER AND THE TECHNICIAN
27  REPLACED THE SOLENOID, BUT THE FAILURE RECURRED. THE VEHICLE
28  WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF

THE FAILURES. THE CONTACT LATER RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 17V209000 (ENGINE AND ENGINE COOLING). THE FAILURE MILEAGE WAS 17,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.  ...UPDATED 07/20/17 *BF  UPDATED 9/28/18*JB"

   f. August 30, 2017 (NHTSA Complaint ID 11020539; 2015 Ford Fusion, 1.5L): "TL* THE CONTACT OWNS A 2015 FORD FUSION. THE CONTACT STATED THAT WHILE DRIVING AT 40 MPH, THE VEHICLE LOST POWER WITHOUT WARNING. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC WHERE THE MECHANIC WAS UNABLE TO PROVIDE A DIAGNOSIS. THE VEHICLE WAS THEN TOWED TO SAYVILLE FORD LOCATED AT 5686 SUNRISE HWY, SAYVILLE, NY 11782 WHERE IT WAS DIAGNOSED THAT COOLANT WAS LEAKING AND BEING BURNED INSIDE THE ENGINE MANIFOLD AND THE COOLER INTAKE MANIFOLD, RELATED GASKETS AND SEALS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED, HOWEVER, THE CHECK ENGINE LIGHT ILLUMINATED AND THE VEHICLE WAS TAKEN BACK TO SABLE FORD, WHERE THE VEHICLE HAD NOT YET BEEN DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND ADVISED THE CONTACT TO FILE A COMPLAINT WITH NHTSA. THE APPROXIMATE FAILURE MILEAGE WAS 83,000.  ..UPDATED 10/25/17 *BF *JS"

79. In total, there were over 2,000 NHTSA complaints reporting problems with Class Vehicles related to the Engine Defect. Plaintiffs have identified at least 230 such complaints submitted between 2012 and 2017 alone, which are compiled and attached as **Exhibit 2**.

80. An additional sampling of 2.3L Ecoboost Engine specific NHTSA complaints, seventy-five (75) in total dating back to 2017, and third-party complaints, are compiled and attached as **Exhibit 3**.

81.     Furthermore, on July 16, 2018, NHTSA's Office of Defects Investigation (ODI) announced it received 40 Vehicle Owner Questionnaire (VOQ) reports for 2013 Ford Escape vehicles equipped with the 1.6L EcoBoost engine.[15] These individuals reported "that the vehicle will suddenly stall without warning while driving" and that the "stalling was caused by overheating of the engine resulting in delayed or no restart possible." As a result of these reports, NHTSA opened Investigation PE18-007 in order "to investigate allegations of loss of motive power" in these vehicles.[16] This investigation remains ongoing.

82.     As is made apparent by the above examples and those discussed earlier in this Complaint, consumers have repeatedly and clearly alerted NHTSA ODI about the Engine Defect and Ford was, or should have been, aware of and monitoring those complaints. Given the volume of complaints, Ford was surely aware of the defect plaguing EcoBoost Engines in the Class Vehicles.

83.     Moreover, the large number and consistency of Class Member complaints describing the propensity of EcoBoost engines in Class Vehicles to leak coolant, expel white smoke, shut down while in use, and/or spontaneously catch fire—as a result of the Engine Defect— demonstrate that Class Members consider the Engine Defect to be a material safety issue to the reasonable consumer.

5.      **Ford is Well Aware that Its Recalls Have Been Ineffective and It Continues to Issue Technical Service Bulletins Regarding the Engine Defect.**

84.     Since 2018, Ford has issued nearly a dozen technical service bulletins (TSBs) to address the Engine Defect. A TSB is a communication issued by a manufacturer that advises a repair shop that many owners of the vehicles at issue are

---

[15] NHTSA, ODI Resume (Investigation PE 18-007), opened July 16, 2018, *available at* https://static.nhtsa.gov/odi/inv/2018/INOA-PE18007-9851.pdf (last visited Sept. 27, 2022)

[16] Letter to Todd Fronckowiak, Assistant Global Director, Automotive Safety Office, Ford Motor Co., NHTSA (Aug. 2, 2018), *available at* https://static.nhtsa.gov/odi/inv/2018/INIM-PE18007-72978.pdf (last visited Sept. 27, 2022)

experiencing a similar problem and, like recall notices, includes recommended technical steps as to how to address the problem. Ford's multiple and ongoing release of these TSBs demonstrate that Ford is well are of the Engine Defect but has still been unable to address the problem. Plaintiffs have copied the language of the various TSBs below.

      a.   <u>3/30/2018       SSM       47204</u>     – Some 2015-2018 Fusion/MKZ/MKC/Escape/ Edge vehicles equipped with a 2.0L EcoBoost engine may exhibit a runs rough condition with DTCs P0300, P0301, P0302, P0303, P0304 and/or P0316. This may be due to coolant intrusion due to corrosion on the engine block. To diagnose this concern, with the engine at normal operating temperature, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If the coolant pressure drops 27.57 kPa (4psi), remove the spark plugs and inspect for coolant in the cylinders. If coolant is found in any of the cylinders, replace the engine long block assembly. Follow normal prior approval process for your Dealership. However, follow the diagnostic repair procedure in this article to determine correct repair. For claiming, use causal part 6006 and applicable labor operations in Section 6 of the SLTS Manual.

      b.   <u>8/13/2018 SSM 47462</u> – 2015-2018 Edge, Fusion, Focus, MKZ, MKC, Escape vehicles equipped with a 2.0L EcoBoost engine may exhibit coolant consumption, white smoke and/or a runs rough condition. Refer to the extended coolant pressure test and checking for combustion gases in Workshop Manual (WSM), Section 303-03A. If internal coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect the cylinder block and head for erosion, pitting, and flatness defects, primarily between the cylinder to cylinder bore bridges. If defects to the aluminum surface on the cylinder block and/or cylinder head are found, follow the cost cap tool for component replacement. Follow WSM, Section 303-01A for the repair procedures

      c.   <u>10/30/2018 SSM 47625</u> – Some 2014-2019 Fusion and 2017-2019

Escape vehicles equipped with a 1.5L EcoBoost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in Workshop Manual (WSM), Section 303-03, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect cylinder block for erosion, pitting, and flatness. Defects will be between the engine block cylinders and cylinder bore bridges. If defects with the surface of the cylinder block and/or cylinder head are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair.

d.      3/7/2019 SSM 47849 – Some 2014-2019 Fusion and 2017-2019 Escape equipped with 1.5L EcoBoost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in WSM, Section 303-03, pressurize the cooling system to 138kPa(20 psi) and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the engine block surface to head gasket interface is required. Carefully inspect engine block cylinders and cylinder bore bridges for erosion, pitting, and flatness. If defects with the cylinder block surface are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair. Ford has found that all returned cylinder heads pass inspection and may have been reused.

e.      12/11/2019 TSB 19-2375 – 2017-2019 Ford Escape; 2014-2019 Ford Fusion. This article supersedes TSB 19-2139 to update the production fix date. Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or

P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, replace the short block and head gasket.

f.  <u>12/20/2019  TSB  19-2346</u> – 2015-2018 Ford Edge; 2017-2019 Ford Escape, Fusion; 2017-2019 Lincoln MKC, MKZ. Some 2015-2018 Edge and 2017-2019 Fusion/MKZ/Escape/MKC vehicles equipped with a 2.0L EcoBoost engine may exhibit a low coolant level, white exhaust smoke and/or a runs rough condition with or without an illuminated malfunction indicator lamp (MIL). Diagnostic trouble codes (DTCs) may include P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To correct the condition, follow the Service Procedure steps to replace the long block engine assembly.

g.  <u>4/2/2020 TSB 20-2100</u> – Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

h.  <u>7/10/2020  SSM  48991</u> – Some 2015-2020 F150/Edge/Fusion, 2016-2018 MKX, 2019-2020 Nautilus, and 2017-2020 Continental vehicles equipped with 2.7L EcoBoost engines may exhibit an illuminated malfunction indicator lamp (MIL) and/or Engine Coolant Over Temperature warning with diagnostic trouble codes (DTCs) P0116, P0117, P0118, P0119, P0128, P0217, P0330, P1026, P1299, and/or P130D. This may be due to the engine coolant temperature (ECT) sensor or knock sensor wiring harness. To correct the condition, replace the 12A648 ECT sensor and 12A699 knock sensor. Do not disconnect the ECT sensor from the knock

26

sensor harness in case parts are called back for analysis. For claiming, use causal part 12A699 and applicable labor operations in Section 10 of the Service Labor Time Standards (SLTS) Manual.

i.   9/8/2021 TSB 21-2269 – Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

j.   4/14/2022 TSB 22-2134 – Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

85.   On information and belief, it took Ford a significant amount of time to develop and implement the technical fixes recommended in the TSBs described above. Preliminary discovery shows that Ford does not issue a TSB or equivalent bulletin without consulting with the CCRG, the Field Review Committee, and other internal entities that evaluate and consider the propriety of field action. In the similar context of recalls, and as discussed above, documents Ford submitted to NHTSA demonstrate that Ford knew about the Engine Defect for several months to a year before it informed vehicle owners. Thus, even though Ford issued its first Engine

Defect-related TSB in March 2018, on information and belief, Ford's development of this TSB dates back to at least September 2017.

### 6.   Ford Created a Customer Service Program for the Defect.

86.   On December 21, 2019, Ford rolled out Customer Service Program (CSP) 19B37 for 2017-2019 Fusion and Escape vehicles equipped with a 1.5L GTDI engine. The program notice stated, "Some of the affected vehicles may exhibit coolant intrusion into the cylinder bores. Customer symptoms include coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition my damage the engine, requiring replacement of the engine short block." Ford directed dealers to reprogram the Powertrain Control Module. This service program has been extended beyond its original term and is now in effect through November 30, 2022. The CSP is offered to vehicle owners, free of charge, with no mileage limitation.

87.   On June 9, 2022, Ford issued the fourth supplement to CSP 19B37.  This supplement, CSP 21N12, allows customers whose vehicles were subject to CSP 19B37 to receive a free engine short block replacement if the vehicle was damaged by the Engine Defect within 7 years of 84,000 miles from the warranty start date and the engine short block is no longer covered under the powertrain warranty.  Even though Ford apparently agrees the Engine Defect is serious enough that it will offer out-of-warranty repairs to certain affected vehicle owners, Ford is still refusing to offer a permanent or sufficient fix to the vast majority of Class Vehicle owners and has not addressed the harm for consumers who already paid out-of-pocket for their repairs.

88.   The Customer Service Program, including the supplements, is insufficient to address the underlying Engine Defect and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.  To the contrary, Ford continues to conceal the true nature of the Engine Defect from Class Members.

89. Since 2012, Ford has issued recalls, TSBs, and CSPs covering every capacity of EcoBoost Engine at issue (1.5L, 1.6L, 2.0L, 2.3L).  Despite this, Ford has failed to permanently or sufficiently remedy the Engine Defect for customers with the EcoBoost Engine.  This ongoing concealment continues to harm Class Members.

**D.** **Ford's Marketing and Concealment**

90. Discovery will show that Ford knowingly marketed, advertised, and sold/leased the Class Vehicles with the Engine Defect while willfully concealing the true—defective—quality and safety risks of the EcoBoost engines installed in these Vehicles.

91. Ford markets the Class Vehicles directly to consumers through nationwide multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media. Ford touts the safety and quality of Class Vehicles, despite its knowledge that the Vehicles are equipped with an Engine Defect that poses severe risks to drivers, passengers, and the public.

92. For instance, in a brochure marketing the 2018 Fusion, Ford describes itself as "steadfast about safety," and specifically identifies the Fusion as "proof of [the company's] commitment to safety." In brochures advertising the 2013 Ford Fusion and 2014 Ford Escape, Ford markets the vehicle as "Quality, Green, Safe, Smart." The 2014 Escape, according to Ford, "proves you can get style, function, and fun in one well-priced package." And the EcoBoost engine, according to Ford, "offer[s] a no-compromise combination of power and efficiency."

93. But in actuality, the Class Vehicles fall far short of these promises. Ford failed to inform consumers of the Engine Defect, which causes coolant to leak into the cylinders, leads to smoke emitting from the exhaust, requires repeated and frequent coolant replacement, and results in cracked cylinder heads, engine overheating, total engine failure—at times while the car is moving at high speeds—and spontaneous engine fires.

94. These hazards do not live up to Ford's assurances of its "commitment to

safety" and the "confidence" that Ford promoted to its customers. Ford concealed from consumers the Engine Defect and its outcomes, and misled the public about the actual quality of the Class Vehicles.

95.    Plaintiffs and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members, including Plaintiffs, justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

96.    As detailed above, discovery will show that Ford has been aware of the Engine Defect since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of repairs and replacement part sales related to the Engine Defect; and the numerous and consistent complaints about the Engine Defect collected by NHTSA.

97.    Through its acts and omissions, Ford has actively concealed the existence and natures of the Engine Defect from Class Members, including Plaintiffs, since at least 2012. Specifically, Ford:

a.    Failed to disclose, and actively concealed, before, at the time of, and after the purchase, lease, and/or service of the Vehicles, any and all known material defects of the Class Vehicles, including the Engine Defect;

b.    Failed to disclose, at the time of and after the purchase, lease, and or service, that the EcoBoost engines installed in Class Vehicles were defective and not fit for their intended purpose;

c.    Failed to disclose, and actively concealed, the existence and pervasiveness of the Engine Defect even when Class Members directly inquired about potential defects affecting their EcoBoost engines during communications with Ford, Ford dealerships, and Ford service centers;

d.    Actively concealed the Engine Defect by forcing Class Members

to bear the cost of stop-gap "solutions" that only temporarily alleviated the symptoms of the defect without permanently and effectively curing the defect;

e.     Actively concealed the Engine Defect by failing to issue a comprehensive and effective Recall providing for the replacement of the defective EcoBoost engines with non-defective engine blocks, and instead, only when the Vehicles remained under warranty, providing for the replacement of one defective, failed engine block with yet another similarly and equally defective engine block.

98.   By engaging in the conduct described above, Ford has concealed, and continues to conceal, the Engine Defect from Class Members. If Class Members had had knowledge of the information Ford concealed, they would not have purchased or leased the Class Vehicles or would have paid less to do so.

## VI.   FRAUDULENT CONCEALMENT ALLEGATIONS

99.   Plaintiffs' claims arise out of Ford's fraudulent concealment of the Engine Defect, and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent that Plaintiffs' claims arise from Ford's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Absent discovery, Plaintiffs are unaware of and unable through reasonable investigation to obtain the true names and identities of those individuals at Ford responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. Ford necessarily is in possession of all of this relevant information.

100.  Plaintiffs allege that at all relevant times, including specifically at the time they and other Class Members purchased or leased their Class Vehicles, Ford knew or should have known of the Engine Defect; Ford was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and Ford never disclosed the Defect to Plaintiffs, Class Members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of a small subset of the Class Vehicles.

101. Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a. **Who**: Ford actively concealed the Engine Defect from Plaintiffs and Class Members while simultaneously touting the safety, comfort, and quality of the Class Vehicles. Discovery will show the true names and identities of those specific individuals at Ford responsible for such decisions.

b. **What**: Ford knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Engine Defect. Ford concealed the Defect and made representations about the safety, comfort, quality, and other attributes of the Class Vehicles.

c. **When**: Ford concealed material information regarding the Defect at all times and made representations about the quality, safety, and comfort of the Class Vehicles, starting no later than 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day. Ford still has not disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Ford has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Vehicles to Ford complaining of the problems with their EcoBoost engines, including recurrent coolant leakage, smoking, failures, and fires, Ford denied any knowledge of or responsibility for the Engine Defect.

d. **Where**: Ford concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Such information is not adequately disclosed in any sales

documents, displays, stickers, advertisements, warranties, owner's manuals, on Ford's website, or by any salesperson at a Ford dealership.

e.   ***How***: Ford concealed the Engine Defect from Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Ford actively concealed the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be material to a reasonable consumer, and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.   ***Why***: Ford actively concealed material information about the Engine Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality, safety, and comfort of the Class Vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## VII.   TOLLING AND THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment and Equitable Tolling

102.   Discovery will show that Ford has known of the Engine Defect in the Class Vehicles since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, and yet has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Engine Defect. Ford continues to conceal the scope and extent of the Defect to this day, as detailed above.

103.   Moreover, Ford's attempts to conceal the defect also include conducting insufficient "Band Aid" repairs during the warranty period, including replacing only certain components, adding a low coolant sensor, and otherwise failing to replace the

defective parts with non-defective parts.

104. Any applicable statute of limitations has been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B.** **Estoppel**

105. Ford was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and, despite its awareness of the Engine Defect, knowingly made representations about the quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon Ford's knowing representations and active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

**C.** **Discovery Rule**

106. The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Engine Defect.

107. Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Engine Defect caused their EcoBoost engines to leak coolant, overheat (leading to, among other things, the cylinder heading cracking), misfire, totally fail, and/or ignite. Even then, Plaintiffs and Class Members had no reason to know the EcoBoost engine failures were caused by a defect in the Class Vehicles because of Ford's active concealment of the Engine Defect.

108. Plaintiffs and Class Members were not reasonably able to discover the Engine Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Engine Defect caused their Vehicles' EcoBoost engines to leak

coolant fluid, misfire, overheat, catch on fire, and totally fail.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

109.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

110.  Plaintiffs bring this class action, including all causes of action stated below, on behalf of themselves and all other similarly situated members of the proposed Sub-Classes (referred to herein as "Class Members") defined as follows:

**California Class:** All California residents who purchased or leased any Class Vehicle.

> **CLRA Sub-Class:** All California residents who purchased or leased any Class Vehicle for personal, household, or family use.

> **Implied Warranty Sub-Class:** All California residents who purchased or leased and took delivery in California of any Class Vehicle.

111.  Plaintiffs intend to seek certification of a "Damages Subclass" under 23(b)(3) for all Class Members who have experienced Engine Defects and an "Owner Subclass" under Rule 23(b)(2) for purposes of declaratory relief as to future Engine Defects, as well as certification of other subclasses and particular issues under Rule 23(c)(4), as warranted.

112.  Excluded from the proposed Class are:  (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officer(s) to whom this case is assigned, and the judicial officer(s) staff; (3) government entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that

the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

### A. <u>**Numerosity**</u>

113.  Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control, as well as from records kept by the Department of Motor Vehicles.

### B. <u>**Typicality**</u>

114.  The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and serviced by Ford. Plaintiffs, like all Class Members, have been damaged by Ford's misconduct in that they purchased/leased a Vehicle they would not have purchased/leased, or would not have purchased/leased at the price they paid, or incurred or will incur the cost of repairs relating to and caused by the Engine Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

### C. <u>**Adequate Representation**</u>

115.  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

116.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of Class Members.

### D.   **Predominance of Common Issues**

117.  There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

      a.    whether the subject engines in the Class Vehicles are defective;

      b.    whether Ford knew or should have known about the Engine Defect, and, if so, how long Ford has known of the defect;

      c.    whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

      d.    whether Ford had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

      e.    whether Ford omitted and failed to disclose material facts about the Class Vehicles;

      f.    whether Ford's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

      g.    whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent, within the meaning of California's Unfair Competition Law ("UCL");

      h.    whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are unfair within the meaning of the UCL;

      i.    whether Ford represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

      j.    whether Ford represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of

1    another;

2            k.     whether Ford advertised the Class Vehicles with the intent not to

3    sell/lease them as advertised;

4            l.     whether Ford's representations and omissions about the true

5    defective nature of the Class Vehicles were likely to create confusion or

6    misunderstanding;

7            m.     whether Ford's representations and omissions about the true

8    defective nature of the Class Vehicles were and are deceptive;

9            n.     whether the Class Vehicles were unfit for the ordinary purposes for

10   which they were used, in violation of the implied warranty of merchantability;

11           o.     whether Plaintiffs and the other Class Members are entitled to a

12   declaratory judgment stating that the EcoBoost engines in Class Vehicles are

13   defective and/or not merchantable;

14           p.     whether Plaintiffs and the other Class Members are entitled to

15   equitable relief, including, but not limited to, a preliminary and/or permanent

16   injunction;

17           q.     whether Ford should be declared financially responsible for

18   notifying all Class Members of the problems with the Class Vehicles and for the costs

19   and expenses of permanently remedying the Engine Defect in the Class Vehicles;

20           r.     whether Ford is obligated to inform Class Members of their right

21   to seek reimbursement for having paid to diagnose, repair, or replace the defective

22   EcoBoost engines.

23       **E.**    **Superiority**

24       118.  Plaintiffs and Class Members have all suffered and will continue to suffer

25   harm and damages as a result of Ford's unlawful and wrongful conduct. A class action

26   is superior to other available methods for fair and efficient adjudication of this

27   controversy.

28       119.  Absent a class action, most Class Members would likely find the cost of

litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

120. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## IX.   CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal Civ. Code § 1750,** *et seq.*
**(On behalf of the CLRA Sub-Class)**

121. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

122. Plaintiffs bring this cause of action individually and on behalf of the CLRA Sub-Class.

123. Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

124. Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

125. The purchase and leases of Class Vehicles by Plaintiffs and the Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

126. The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

127. Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal.

Civ. Code § 1761(d).

128. Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

a. Ford misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

b. Ford misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c. Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d. Ford misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

e. Ford misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

129. Ford repeatedly engaged in these unfair and deceptive acts or practices in the course of its trade or business. These acts or practices were material, capable of deceiving a substantial portion of the purchasing public, and caused economic harm to purchasers and lessees of the Class Vehicles, including the Plaintiffs.

130. By 2012, and well before the sale or lease of Class Vehicles, Ford knew or should have known about the Engine Defect affecting the Class Vehicles. Ford further knew or should have known that the Class vehicles were defectively designed or manufactured, that, as a result of this defect, the EcoBoost engines would repeatedly fail, and that they were not suitable for their intended use.

131. Ford had exclusive knowledge of material facts concerning the existence of the Engine Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so by denying the existence of a defect to consumers—such as Plaintiffs—who contacted Ford about the failures of their EcoBoost engines. Ford

also concealed the Engine Defect by failing to provide an effective and permanent remedy to all of the Class Vehicles and by replacing failed engines with equally defective engines, bound to suffer from the same failures.

132. Ford was under a duty to Plaintiffs and Class Members to disclose the defective nature of the EcoBoost engines, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Engine Defect, because:

     a.   Ford was in a superior position to know the true state of facts about the Engine Defect in the Class Vehicles;

     b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Engine Defect until, at the earliest, the manifestation of the Defect; and

     c.   Ford knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Engine Defect prior to its manifestation.

133. In failing to disclose the defective nature of the Class Vehicles, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

134. The facts concealed or not disclosed by Ford to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Engine Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the Engine Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

135. Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective EcoBoost engine. It is a reasonable and objective consumer expectation for consumers to expect that the engine will not suffer from repeated and continual coolant leakage into the cylinders, causing

overheating and leading the cylinder head to crack and misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire.

136. As a result of Ford's misconduct, Plaintiffs and Class Members have been harmed in that the Class Vehicles contain defective EcoBoost engines and suffer from repeated and continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack, causing misfires, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire—all of which create a grave risk of serious injury to person and property and cause Class Members to spend money to attempt to remedy the Defect.

137. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer harm in that they have a Vehicle with a defective EcoBoost engine and they have experienced and may continue to experience their Class Vehicles' engines leaking coolant into the cylinders, causing overheating and leading the cylinder head to crack, misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire, for which Ford has refused to provide and effective and permanent fix.

138. Plaintiffs and the Class seek to recover actual damages, an order enjoining Ford's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

139. In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a), via letter dated February 2, 2024,  relating to the Class Vehicles purchased by Plaintiffs and Class Members, and demanded that Ford, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. To date, Ford has not agreed to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of the California Class)**

140.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

141.  Plaintiffs bring this cause of action individually and on behalf of California Class Members.

142.  California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

143.  Ford committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

144.  Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Ford's failure to provide a permanent remedy to fix the Engine Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. Ford's acts and practices were additionally unfair because the harm to Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Ford's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

145.  Ford committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Engine Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were, for example, high quality,

functional, and "proof of [Ford's] commitment to safety," and that Ford itself is "steadfast about safety," when, in fact, the Engine Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Ford's representations, omissions, and active concealments about the Engine Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

146. Ford's unfair or deceptive acts or practices occurred repeatedly in the course of Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

147. Plaintiffs relied on Ford's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

148. As a direct and proximate result of Ford's unfair, unlawful, and deceptive practices, Plaintiffs have lost money.

149. Plaintiffs would consider purchasing or leasing similar Ford vehicles in the future if Plaintiffs could rely on Ford's representations regarding the vehicles.

150. Plaintiffs and Class Members seek an order enjoining Ford from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

**THIRD CAUSE OF ACTION**
**California Breach of Express Warranty**
**(On behalf of the California Class)**

151. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

152. Plaintiffs bring this cause of action individually and on behalf of California Class Members.

153. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

154. Ford provided all purchasers and lessees of Lincoln-branded Class

Vehicles with the Lincoln warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford warranty.

155. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

156. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

157. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

158. For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

159. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

160. Ford manufactured and/or installed the engines and the engines'

component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

161. Ford provides additional general warranty coverage for Ford and Motorcraft parts sold on or after 2013 for a period of 24 months and unlimited miles.

162. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs and the Class Members.

163. As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant.  Plaintiffs and Class Members submitted their Vehicles for warranty repairs as referenced herein.  Ford failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

164. Plaintiffs and the Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

165. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Plaintiffs and the Class Members.

166. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

167. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

168.  Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

169.  Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

170.  The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs and the Class Members. Among other things, Plaintiffs and the Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

171.  Plaintiffs and the Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

172.  Plaintiffs and the Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

173.  Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

174.  Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

175.  As a direct and proximate cause of Ford's breach, Plaintiffs and the Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and the Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

176.  As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the Class Members have been damaged in an amount to be determined at trial.

177.  Ford's acts in failing and/or refusing to repair the materials defect during the warranty period so as to bring the Vehicles into conformity with the express warranties, deprived Plaintiffs and members of the Class of their rights guaranteed them under the express warranties offered by Ford.

178.  As a direct and proximate result of the willful failure of Ford to comply with its obligations under the express warranties, Plaintiffs and members of the Class have suffered actual and consequential damages.  Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the materials defects identified herein.  The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**Under the Song-Beverly Consumer Warranty Act**
**Cal. Civ. Code §§ 1790, *et seq.***
**(On behalf of the Implied Warranty Sub-Class)**

179.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

180.  Plaintiffs bring this cause of action individually and on behalf of the

Implied Warranty Sub-Class Members.

181. Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

182. Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

183. Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

184. Ford impliedly warranted to Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

185. Ford impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the EcoBoost engine.

186. The propensity of the Engine Defect to cause coolant to leak, seep into the cylinders, cause the cylinder head to crack, cause misfiring, cause white smoke to emit from the vehicle, cause the engine to fail and/or ignite renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

187. The Engine Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

188. The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Engine Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

189. In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective EcoBoost engines.

190. The Engine Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

191. Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Engine Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

192. As a result of Ford's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

**FIFTH CAUSE OF ACTION**
**California Breach of Implied Warranty**
**(On behalf of the Implied Warranty Sub-Class)**

193. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

194. Plaintiffs brings this cause of action individually and on behalf of California Class Members.

195. The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

196. Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

197. Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

198. When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

199. Because Plaintiffs and the Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Plaintiffs and the Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Plaintiffs and the Class Members, on the other hand.  Furthermore, Ford provided warranties directly to Plaintiffs and the Class Members and Plaintiffs and the Class Members are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

200. Nonetheless, privity is not required here because Plaintiffs and the Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships.  These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles, as well as service and perform warranty repairs on Ford's behalf. Plaintiffs and the Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships.  Plaintiffs and the Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

201. Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain:  a Vehicle with a nondefective EcoBoost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

202. Plaintiffs and the Class Members who purchased or leased Certified Pre-Owned Class Vehicles are likewise entitled to the benefit of their bargains:  a Vehicle

with a nondefective EcoBoost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

203.  Class Members who purchased Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of implied warranty claims.

204.  Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

205.  The Engine Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

206.  Had the Engine Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased, or would not have been sold or leased at the same price for which Class Members paid.

207.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## X.    **PRAYER FOR RELIEF**

208. Plaintiffs on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Ford, as follows:

   a.    an order certifying the proposed Class, any appropriate subclasses, and any appropriate classes with respect to particular issues, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

   b.    a declaration that the EcoBoost engines in the Class Vehicles are defective;

   c.    a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

   d.    an order enjoining Ford from further deceptive distribution, sales,

and lease practices with respect to the Class Vehicles;

        e.    an order requiring Ford to permanently repair Class Vehicles, within a reasonable time period and at no cost to Class Members, so that they no longer possess the Engine Defect;

        f.    an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

        g.    an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, 15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

        h.    an award of pre-judgment and post-judgment interest, as provided by law; and

        i.    such other relief as may be appropriate under the circumstances.

## XI.   **DEMAND FOR JURY TRIAL**

209. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.


Dated: August 8, 2024             Respectfully submitted,


                        */s/ Tarek H. Zohdy*
                        Tarek H. Zohdy (SBN 247775)
                        Cody R. Padgett (SBN 275553)
                        Laura E. Goolsby (SBN 321721)
                        Nathan N. Kiyam (SBN 317677)
                        **CAPSTONE LAW APC**
                        1875 Century Park East, Suite 1000
                        Los Angeles, California 90067
                        Telephone:  (310) 556-4811
                        Facsimile:  (310) 943-0396
                        Tarek.Zohdy@capstonelawyers.com
                        Cody.Padgett@capstonelawyers.com
                        Laura.Goolsby@capstonelawyers.com
                        Nate.Kiyam@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
**KERSHAW TALLEY BARLOW PC**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Mark P. Chalos (*pro hac vice forthcoming*)
**LIEFF   CABRASER   HEIMANN   &
BERNSTEIN, LLP**
One Nashville Place
150 Fourth Avenue, Suite 1650
Nashville, TN  37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Annika K. Martin
Gabriel A. Panek (*pro hac vice forthcoming*)
**LIEFF   CABRASER   HEIMANN   &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
akmartin@lchb.com
gpanek@lchb.com

Russell D. Paul (*pro hac vice forthcoming*)
Abigail Gertner (*pro hac vice forthcoming*)
Amey J. Park (*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
Email: rpaul@bm.net
        agertner@bm.net
        apark@bm.net

Patrick Newsom (*pro hac vice forthcoming*)
**NEWSOM LAW PLC**
40 Music Square East
Nashville, TN 37203
Telephone: 615-251-9500
patrick@newsom.law

Thomas P. Thrash (*pro hac vice forthcoming*)
Will T. Crowder (*pro hac vice forthcoming*)
**THRASH LAW FIRM**
1101 Garland Street
Little Rock, AR 72201
501-374-1058
Fax: 501-374-2222
tomthrash@thrashlawfirmpa.com
willcrowder@thrashlawfirmpa.com

*Attorneys for Plaintiffs and the
Proposed Classes and Subclasses*